McGREGOR W. SCOTT
United States Attorney
PHILIP A. SCARBOROUGH (SBN 254934)
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900
Philip.Scarborough@usdoj.gov

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

J.I.,

        Plaintiff,

v.

UNITED STATES,

        Defendant.

CASE NO. 1:18-CV-00363-LJO-SAB

DECLARATION OF JACOB KOLB IN SUPPORT OF UNITED STATES' MOTION TO DISMISS

I, Jacob Kolb, declare as follows:

1. I am a Border Patrol Agent for the United States Customs and Border Protection ("CBP"). I have been a Border Patrol Agent since June 1, 2015. My regular duty station is the Presidio Border Patrol Station in Presidio, Texas. I have been assigned to this location since June 1, 2015. I have personal knowledge of the matters stated in this declaration and, if called as a witness, would competently testify thereto.

2. Presidio, Texas, is located next to the Rio Grande River, which forms the international border between the United States and Mexico. The area in and around Presidio is commonly used by individuals seeking to enter the United States without lawful authorization, including human traffickers and drug smugglers, as well as individuals seeking to enter the United States for humanitarian reasons, such as asylum seekers. My job responsibilities include patrolling the border near Presidio to apprehend individuals who have entered the United States unlawfully, to provide humanitarian and EMT assistance

to individuals encountered at the border who are in physical distress, and to process any detainees to assist in determining a proper disposition of their immigration status under United States law.

3. In October 2015, CBP published a policy manual that sets forth CBP's policies relating to the transportation, escort, detention, and search of individuals who are apprehended at or near the borders of the United States. The title of this publication is U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search (the "National Standards"). A true and correct copy of this publication is attached hereto as Exhibit 1.

4. The National Standards set forth several policies that provide guidance to CBP agents on how to transport, search, and detain different categories of individuals who may be apprehended while crossing the U.S. border without proper authorization. These include, for example, guidelines on how to identify and process populations that may be at higher risk for abuse or exploitation, including underage individuals or individuals who present information indicating that they may be at a higher risk for abuse, including sexual abuse. *See* Ex. 1 at 14-15.

5. Although the National Standards set forth several factors that detaining agents are to consider when evaluating whether an individual within a potentially at risk population qualifies as an at-risk individual, nothing in the National Standards or in any other applicable policy establishes mandatory or specific requirements that detail which individuals within the populations must be categorized as at-risk. *See* Ex. 1 at 14. Factors such as who the individual is travelling with and information relayed from the detainee, as well as agents' judgments about the detainees' demeanor, physical appearance, state of mind, and health factors are all considered when deciding whether an individual detainee should be classified as at-risk.

6. The National Standards also set forth several possible mitigating measures that can be taken to protect individuals who are categorized as at-risk. These include, for example, keeping the at-risk individual in direct sight and sound supervision, keeping them in a single-occupancy hold room, and monitoring them in an open area or in a hold room that is actively monitored by video. *See* Ex. 1 at 24. Nothing in the National Standards or in any other applicable policy requires detainees who are classified as at-risk to be continuously monitored by more than one CBP agent.

7. On the night of July 11, 2016, I was on duty in Presidio, Texas, working with my partner, Gregory Serwatka. At approximately 11:20 p.m., a camera sensor in the area was activated by a group of four individuals who appeared to have crossed the border unlawfully. Agent Serwatka and I were asked to assist a group of CBP agents in searching the area to locate those four individuals.

8. As we were driving through Presidio in a CBP vehicle, Agent Serwatka and I noticed three individuals walking toward our vehicle and waving at it. We stopped to investigate whether these individuals were associated with the camera activation that had prompted our search. The three individuals were the plaintiff in this action, J.I., who was 17 years old on that date; plaintiff's sister, who was 19 years old at that time; and an unrelated male who also claimed to be a minor. I have subsequently learned that investigators later determined that this male individual in fact was over the age of 18 on that date and had presented an altered birth certificate to claim he was a minor.

9. Agent Serwatka and I questioned these three individuals to determine whether they were lawfully present in the United States. We determined that they were not part of the group of four individuals who had activated the sensor. We also determined that the group of three had traveled to the United States from Guatemala, had crossed into the United States earlier that night unlawfully, and did not have proper authorization to be present in the United States. We therefore took them into custody and transported them to the Presidio Border Patrol Station. We arrived at the station at approximately 11:36 p.m. J.I. and her group did not appear to be in any unusual distress. During their apprehension and transport, no one in the group expressed any concern about their safety or relayed any information to Agent Serwatka or me suggesting any unusual safety concerns.

10. The Presidio Border Patrol Station has three holding cells, all of which are in the direct line of sight of the area used for processing detainees. Consistent with CBP policies regarding gender segregation, juvenile segregation, and maintaining family unity to the extent feasible, Agent Serwatka and I placed J.I. and her sister by themselves in Cell # 3. The unrelated male individual, who at that time was thought to be a minor, was placed by himself in Cell # 1. Cell # 2 also had several other individuals who had been previously detained in it. It took approximately 5 minutes to place J.I., her sister, and the unrelated male into the cells. At approximately 11:41 p.m., Agent Serwatka and I left the station to resume assisting with the search for the four individuals who had activated the camera. CBP

Agent Fernando Saucedo remained at the station to supervise the individuals in custody. When we left the station, he was in the area with a direct line of sight to the holding cells.

11. At the time we left the station, we had no information that caused us to believe J.I. was in any danger of potential abuse. By virtue of being a minor, J.I. was considered to be part of a potentially at-risk population. For that reason, we placed her in a separate holding cell with her adult sibling. Because she was traveling with an adult relative and was placed in a separate cell with her relative, we did not consider her to be an at-risk individual at that time.

12. Due to the large number of unlawful border crossings in the area near Presidio and the need to apprehend human traffickers and other individuals associated with unlawful border crossings, it is sometimes necessary for as many CBP agents as possible to participate in field operations. These operational demands occasionally necessitate leaving only one agent at the station to supervise any detainees who may be in custody. The decision concerning whether a single agent will be left at the station is one made by command staff. There are several considerations that go into deciding how to staff field operations. For example, when a group of individuals has activated a border sensor, as occurred on the night of July 11-12, 2016, several agents typically must respond to cover a wide enough area for the search and to ensure there is a proper amount of back up for agent safety.

13. Sometime between 11:41 and midnight, Agent Serwatka and I were contacted by our supervisor who informed us that the four adult males who had activated the sensor had been detained. Our supervisor requested assistance in transporting those individuals to the Presidio CBP station. Agent Serwatka and I met the agents who had apprehended the four men, and we transported some of those individuals to the station. We arrived back at the station at approximately 12:20 a.m. on July 12, 2016.

14. This group of four men provided information that suggested another individual was supposed to meet them on the United States side of the border to transport them further into the United States. Based on that information, several agents, including Agent Serwatka, Agent Saucedo, and myself, returned to the field to set up an operation to apprehend this other individual, who we suspected of being affiliated with human trafficking. We returned to the station at approximately 2:15 a.m.

15. At approximately 2:43 a.m., I was approached by J.I.'s sister, who informed me of the allegations at issue in this case. Based on that new information, Agent Serwatka and I immediately

reported the allegations to our supervisor, who reported them to the watch commander, and an investigation into the allegations began immediately.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed the 6 day of June at Presidio, Texas.

_____
Jacob Kolb